[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal from the action of the defendant condemning a strip of land along property owned by the plaintiffs for the widening of Division Street in Ansonia. The plaintiffs applied for a review of the Statute of Compensation filed with the Notice of Taking by the defendant. The matter was referred to this court for hearing and decision. The order of reference directed the court to view the property which the court did on September 7, 1990 and on other occasions thereafter. CT Page 1866
The property taken is a trapazoid 187 feet plus along Division Street, 21 feet plus on the west, 196 feet plus on a line parallel to and 16 feet distant from the line along Division Street and 16 feet plus on the east. It contained 0.07 acre + or 3.049 square feet +. The taking also included an easement for damage 100 square feet in area bordering the taken area towards its easterly end.
The defendant claims that the area taken should be valued at $5.20 per square foot or $16,000.
The plaintiffs point out that the area taken was used in connection with a fast food restaurant, known as Burger King, owned by them and operated on the land immediately to the north of the area taken, that the area taken had been used for parking for the customers of the restaurant and in part for cars waiting to give orders for take out food from the restaurant and the taking has interfered with the business of the restaurant to their financial loss. Such claimed factors may be considered by the court. Bowen v. Ives, 171 Conn. 231. On Page 236 the court stated: "In determining the market value of a remainder after a partial taking, it is proper for the trier to consider all elements which are a natural and proximate result of the taking and which could legitimately affect the price a prospective purchaser would pay for the land."
The land owned by the plaintiffs extends northerly from Division Street about 336 feet. Its easterly edge abuts land of the Railroad Company. That line extends 362 feet northerly from Division Street. The northerly line of the land is 126 feet long. The whole property is 88,748 square feet in area. At the southerly end of the property is the Burger King Restaurant, 4,180 square feet in area. At the northerly end of the property is a one story commercial structure, 17,828 square feet in area containing a CVS Drug Store, a vacant store, and an office for the plaintiffs. The whole property is paved and has parking slots painted in the pavement for 112 cars.
The plaintiff has divided the 88,748 square feet of the property into two areas, assigning 34,948 square feet to the Burger King Restaurant with parking for 30 cars and 53,800 square feet to the commercial structure at the northerly end of the property with parking for 82 cars. Such arbitrary divisions cannot be seen on the ground. The map on page A-6a of the plaintiffs Exhibit B indicates that on the easterly and westerly sides of the property just north of the Burger King Restaurant are two: "Burger King Parking Signs". If a line is drawn on the map between the two signs, the amount of CT Page 1867 parking spaces between that line and Division Street is 33. The inspection made by the court of the property did not reveal these signs and no other signs were seen indicating that any parking spaces were only for the Burger King Restaurant and others were only for the CVS Drug Store. In the area between the Burger King Restaurant and the structure containing the CVS Drug Store were 68 parking spaces. The plaintiffs claim that at peak business periods before the taking the 30 parking spaces for the Burger King Restaurant were "already at saturation". However, the named plaintiff testified that customers could park anywhere in the area between the Burger King Restaurant and the CVS Drug Store where there were the 68 parking spaces. The court also notes from its inspection that 3 parking spaces were taken for the planted area on the east side at the exit-entrance to Division Street and also the 3 handicapped parking areas are now provided in the area along Division Street with 3 regular parking areas. Section 14-253 (a)(e) of the General Statutes does not require that any handicapped parking spaces be provided for a parking area of the size of those located on the plaintiffs' whole property. If there is a local ordinance concerning handicapped parking it was not called to the court's attention. If parking were a problem and the taking of the strip by the defendant compounded that problem the court does not believe that the plaintiffs would have allowed the 3 parking spaces on the east line of the property next to Division Street to be eliminated or the 3 handicapped parking spaces along Division Street to be provided. Consequently, the court finds as a fact that the taking by the defendant did not eliminate any parking spaces for the Burger King Restaurant to the plaintiffs' financial loss and have any effect on the fair market value of the plaintiffs' property after the taking.
The plaintiffs also claim that the taking took spaces used by cars waiting to call in their orders to be picked up at the drive-in window. The maps in Plaintiffs' Exhibit B, pp. A-6a and A-6b, show that the stacking spaces for these cars were reduced from 5 spaces before to 2 spaces after the taking. The named plaintiff testified that if a customer can not get in line or find a parking space he would not come back the next time. He also testified that the count of checks for orders dropped 18% between July 1989 before the taking and July 1990 after the taking. These checks are issued for each order and do not show the number of customers served by each order.
The plaintiffs had a study made of the percent of business attributable to the drive-in window and found that this was 58.3%. Plaintiffs' Exhibit B, p. 66. A further CT Page 1868 study on page 67 of that exhibit resulted in the conclusion that the taking and the claimed loss of parking spaces and stacking spaces for the drive-in window caused twice the loss of business at the drive-in window as the loss in sit down business. The plaintiffs' then claim on page 64 that these losses can be computed as economic obsolescence of the restaurant building in the amount of $100,979.
The court can see that this claimed loss of business could cause obsolescence. However, this $100,979 claimed figure (rounded to $100,000 hereinafter) also included claimed obsolescence because of the claimed reduction in parking spaces for sit down customers of the restaurant which the court has found not to be a fact. Thus, the $100,000 figure must be restated to reflect the court's conclusion. The plaintiffs had claimed that twice the amount of claimed obsolescence was due to the loss of business at the drive-in window as compared to the claimed loss of sit down business. Two thirds of the claimed $100,000 is $66,000.
On Page 48 of Plaintiffs' Exhibit B is the reported gross business of the restaurant as follows:
Year Sales Check average
 1985 $1,084,400 $2.88 1986 957,402 3.16 1987 997,122 3.33 1988 928,981 3.61
Dividing the check average into the sales figures gives the following number of checks per year.
 1985 376,529 1986 302,975 1987 299,436 1988 257,335
The figure shows that the percent of checks each year compared to the year before was:
 1986 80% 1987 98% 1988 85%
Adding the percentage loss each year and dividing by 3 gives an average loss for each succeeding year of 12%. So the named plaintiff's testimony that the count of the number of checks between July 1989 and July 1990, after the taking, dropped 18% means that 12% was the normal historical drop and CT Page 1869 the further loss of 6% was caused by the reduction in the number of stacking spaces for the drive-in window. This requires the conclusion that the economic obsolescence caused by the loss in business due to the taking must be reduced by one third of 66,000 to $22,000.
The plaintiffs claim that the fair market value of the restaurant property before the taking is as follows:
 Building (less depreciation) $347,650 Site Improvements 75,000 Land value 420,000 $840,650
The court computes the fair market value of the restaurant property after the taking as follows:
The building reproduction cost of $429,197 must be reduced by normal depreciation of $81,547 plus economic obsolescence because of loss of business at the drive-in window of $22,000 to $325,650.
Site improvements of $75,000 must be reduced by $5000, for loss of the pavement in the trapazoidal area, to $70,000.
The land left after the taking was 31,899 square feet. However, 100 square feet of that area was taken by the defendant for a drainage easement. The plaintiffs' originally valued the property at $12.00 a square foot. While the area is now smaller than before the taking, the court cannot see that the taking has caused the remaining land to be worth less per square foot than before the taking. Division Street is now wider than before and can accommodate the traffic flow better. The new Stop and Shop just east of the railroad tracks will draw additional traffic to the area, most of which will pass by the plaintiffs' property. The 31799 square feet of the area unencumbered by the drainage easement multiplied by the $12.00 per square foot which the court finds to be proper under all the circumstances equals $381,588. The 100 square foot easement area should be valued at $6.00 per square foot or $600. That makes the fair market value of the remaining land to be $382,188.
The court finds that the fair market value of the restaurant property after the taking to be as follows:
 Building (less depreciation and obsolescence) $325,650 Site Improvements 70,000 Land Value 382,188 CT Page 1870 $777,838
The difference in the fair market value of the plaintiffs' property before and after the taking is $62,812.
Judgment may enter for the plaintiffs to recover of the defendant $62,812. plus a fee for the plaintiffs' appraiser of $5000, plus interest on the award by this judgment over the original award of the defendant plus costs.
THOMAS J. O'SULLIVAN, TRIAL REFEREE.